**ASTRA PHARMACEUTICAL PRODUCTS, INC., Appellant,**

v.

**PHARMATON, S. A., d.b.a. Pharmaton A. G. and Pharmaton Ltd., Appellee.**

**Patent Appeal No. 7261.**

United States Court of Customs and Patent Appeals.
May 20, 1965.

---

3. I agree with appellant that claims 9–13 and 16 are neither anticipated nor rendered obvious by Link.

Francis J. Sullivan, New York City (Joe E. Daniels, New York City, of counsel), for appellant.

Submitted on record by appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

MARTIN, Judge.

Appellee Pharmaton, S. A., d.b.a. Pharmaton A. G. and Pharmaton Ltd. (Pharmaton), filed an application [1] to register LIDOCATON on the Principal Register as a mark for a local anesthetic for dental and medical purposes.

Registration has been opposed [2] by appellant Astra Pharmaceutical Products, Inc. (Astra). Astra alleges that prior to the filing date of appellee's application it had manufactured and sold this product, a local anesthetic known as lidocaine,[3] for medical and dental purposes. A. U. S. patent [4] had been obtained for the anesthetic by Astra's parent company, and Astra has been manufacturing the product known generically as lidocaine under an exclusive license and marketing the product under the trademark XYLO-CAINE.[5] The board noted (137 USPQ 899, 900):

"* * * In its literature and on its labels, opposer emphasizes that 'XYLOCAINE' is its trademark and that lidocaine is the generic designation therefor, although in some instances the word lidocaine appears more prominently and in larger type than does the trademark. Opposer's lidocaine is prepared in various forms such as a 'lidocaine hydrochloride' solution for injection, an ointment for topical use, and a jelly,

1. Application serial No. 115,721, filed March 15, 1961, based on Swiss Reg. No. 146,043 having a filing date of March 17, 1953, and International Reg. No. 169,442 of May 22, 1953, published May, 1953.

2. Opposition No. 41,210.

3. Lidocaine is alpha-diethylaminoaceto-2, 6-xylidide, according to The National Formulary (1955) p. 325.

4. U. S. Patent No. 2,441,498, issued May 11, 1948.

5. Reg. No. 534,232, dated Dec. 5, 1950.

and these products have many uses as a local anesthetic both in the medical and dental professions. Opposer has advertised its various anesthetic products under its trademark and the generic name therefor in professional and trade publications, and in excess of $3,000,000 has been expended on such advertising. Additionally, many articles have been written in professional journals concerning the many desirable characteristics and diverse uses of lidocaine as a local anesthetic. As a consequence of the above, opposer's anesthetics have been extensively used by the medical and dental professions and would be known in such professions both by the generic name lidocaine and by opposer's trademark therefor. While the majority of opposer's products are prescription items and are sold primarily through drug wholesalers and surgical supply houses, opposer also markets a lidocaine ointment for the treatment of sunburn, poison ivy, minor cuts and abrasions, and the like which is sold over-the-counter. Although opposer is the exclusive licensee under the patent of lidocaine anesthetics in this country it has licensed other pharmaceutical manufacturers to use lidocaine as an ingredient in their pharmaceutical products."

The record shows that Pharmaton's LIDOCATON anesthetic comprises lidocaine hydrochloride in a sterile solution. For purposes of this appeal the goods of the parties are identical, that is, they *are* lidocaine.

Appellant took testimony, and the case was briefed and argued before us by its counsel. Appellee Pharmaton has not taken testimony, filed a brief or appeared by counsel, submitting only on the record.

■ The board held, and we agree, that "the word lidocaine was dedicated, from its inception, to the public for use as a common descriptive name and that opposer therefore cannot claim any exclusive rights thereunder." The board

then dismissed the opposition, finding the mark LIDOCATON which is sought to be registered to be "readily distinguishable" from the *generic* name of the goods, lidocaine. The board stated:

"Although the law on the subject is not crystal clear, it seems to us from an analysis of cases thereon that the question for determination in the instant situation is whether or not the mark sought to be registered is the legal equivalent of the generic name for the product. In other words, does 'LIDOCATON' so closely resemble lidocaine phonetically or constitute a mere misspelling or contraction thereof that it would either fail to function as a trademark or come within the statutory provisions of Section 2(e) of the Act which prohibits the registration of 'merely descriptive' terms.

"When viewed in light of the above, it is concluded that applicant's LIDOCATON', while containing the first six letters of the word lidocaine, is otherwise readily distinguishable therefrom and that it therefore cannot be regarded as the legal equivalent thereof."

■ The issue here is that of descriptiveness of a mark as compared to a generic name under section 2(e)(1) of the statute, 15 U.S.C. § 1052(e)(1), which states:

Sec. 2 (15 U.S.C. § 1052) Trademarks registerable on the principal register.

"No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it—

\*    \*    \*    \*    \*    \*

"(e) Consists of a mark which, (1) when applied to the goods of the applicant is merely descriptive or deceptively misdescriptive of them,
\*   \*   \*."

The issue of descriptiveness can be raised in an opposition proceeding, Armour &

Co. v. Organon, Inc., 245 F.2d 495, 44 CCPA 1010; R. Neumann & Co. v. Overseas Shipments, Inc., 326 F.2d 786, 51 CCPA 946; R. Neumann & Co. v. Bon-Ton Auto Upholstery, Inc., 326 F.2d 799, 51 CCPA 934; Polaroid Corp. v. Photo-Plastics, 341 F.2d 936, 52 CCPA ——, if the opposer would be damaged by the registration sought, should it be descriptive, Meehanite Metal Corp. v. International Nickel Co., 262 F.2d 806, 46 CCPA 765; Armour & Co. v. Organon, Inc., supra.

■ On the issue of a party's right to oppose registration of a descriptive term under section 2(e), this court in Singer Mfg. Co. v. Birginal-Bigsby Corp., 319 F.2d 273, 276, 50 CCPA 1380, 1385, stated:

"* * * In DeWalt, Inc. v. Magna Power Tool Corp., 289 F.2d 656, 48 CCPA 909, at CCPA p. 918, we pointed out that 'damage' will be presumed or inferred when the mark sought to be registered is *descriptive* of the goods of the opposer and the opposer is one who has an interest in using the descriptive term in its business, collecting a number of cases supporting the point. We also pointed to a number of cases which indicate that the reason for presuming damage is potential interference with opposer's rights predicated on the statutory rights flowing from registration. * * *

* * * * * *

* * * [section 2(e)(2)] should be enforced at the instigation of anyone having a real interest in its enforcement without undue concern over just what the nature of the damage might, in future, be from granting the registration. Such 'damage' is always speculative and not often subject to precise proof."

Appellant Astra being a manufacturer and marketer of lidocaine clearly is not an intermeddler, Singer Mfg. Co. v. Birginal-Bigsby Corp., supra. There being no difference between the goods, direct competition will occur. In Otard, Inc. v. Italian Swiss Colony, 141 F.2d

706, 31 CCPA 955, 958, an importer of Cognac, a particular regional brandy of France, had sufficient standing to oppose registration of "Calognac," a California grape brandy, by virtue of the descriptive use of the term Cognac made by opposer in its business. It is evident from the record that if LIDOCATON is found to be descriptive of the anesthetic lidocaine within the meaning of the trademark law, appellant does have sufficient interest to justify the conclusion that damage to it will ensue.

The Singer case, and the Overseas and Bon-Ton cases, supra, are not particularly helpful on the issue of descriptiveness here. The Singer case held that the mark AMERICAN BEAUTY when applied to sewing machines made in Japan was geographically deceptively misdescriptive under section 2(e)(2). The Overseas and Bon-Ton cases held the marks VYNAHYDE and DURA-HYDE, respectively, to be deceptively misdescriptive when applied to plastic film used in the manufacture of shoes or for auto seat covers. As stated in the Overseas case, the term DURA-HYDE would convey "to the minds of purchasers that the material was composed of leather" (326 F.2d 789, 51 CCPA 951). Since the goods here are identical, confusion cannot result in the purchaser obtaining other than lidocaine. There being no contention that the term LIDOCATON is *deceptively misdescriptive*, the Singer, Overseas, and Bon-Ton cases are inapposite to the issue of *descriptiveness* herein.

Similarly we think that language in the Otard case, supra, indicates that the issue there, if cast in terms of the 1946 Act, would actually involve the question of whether "Calognac" as applied to a California grape brandy was deceptively misdescriptive of cognac, a term which was well-known as solely descriptive of a grape brandy coming from a particular region of France.

In the Meehanite case, supra, applicant sought registration for the word "Spherulite" as a mark for iron castings. "Spherulite" is a term well known to

foundrymen and metallurgists as properly referring to certain microstructure internal to the iron of the castings, not the castings themselves. The term was held to be descriptive within the meaning of the trademark law when applied to iron castings. The opposer in the Meehanite case would have been damaged by the registration "by being deprived of the use of the term to describe its products" (262 F.2d at 807).

In Martell & Co. v. Societe Anonyme de la Benedictine, 116 F.2d 516, 28 CCPA 851, a manufacturer of brandy had sufficient interest to be permitted to oppose the application of a manufacturer of Benedictine to register the mark *"B and B" overlaid on faintly hatched letters "DOM"* for a 50/50 mixture of Benedictine and a brandy. "B and B," however, was the descriptive name of such a 50/50 mixture. The court held the letters "DOM" to be so "faintly hatched" as to be insignificant (116 F.2d at 519, 28 CCPA at 855), and thus registration of the composite mark as applied for was denied since it "would, in effect, be equivalent to registration of the term 'B and B' by itself." (116 F.2d at 519, 28 CCPA at 856). Unlike Meehanite, the very term was not sought to be registered in Martell.

This court found, in Armour & Co. v. Organon, Inc., supra, a word sought to be registered, "Cortrophin," to be merely suggestive and not a mere contraction, telescoping, or misspelling of the name of a drug, corticotrophin. The court, in holding "Cortrophin" not to be descriptive, found it unnecessary to discuss the likelihood of damage to opposer, although acknowledging the principle that likelihood of damage is an element for an opposition involving a 2(e) question.

In American Druggists' Syndicate v. United States Industrial Alcohol Co., 55 App.D.C. 140, 2 F.2d 942 (1924), a manufacturer of compositions containing alcohol opposed registration of the term "Al-Kol" as a trademark for a rubbing composition containing 92.5% alcohol. The court of appeals denied the registration noting that the term "Al-Kol" was "descriptive of the goods on which it is used, since they contain a large percentage of alcohol" (2 F.2d at 943). As in the Armour, Otard, and Martell cases, a variation of the generic term was sought to be registered.

The question of descriptiveness here is somewhat different from the Armour or Meehanite cases. Unlike the Meehanite case we do not have the question whether the very term which describes a property or quality of the material from which the goods are made is descriptive of the goods themselves. As in the Armour, Otard, Martell, and American Druggists' cases, we must determine whether somewhat different terms are equally descriptive when applied to "identical" goods. The drugs in the Armour case were sold solely by prescription, while here the goods are sold both by prescription and over-the-counter to the general public, as in the American Druggists' case.

In analyzing the above cases with a view to find a test for descriptiveness to be applied herein, the words of then District Judge Learned Hand in Franklin Knitting Mills, Inc. v. Fashionit Sweater Mills, Inc., 297 F. 247 (S.D.N.Y. 1923) are recalled to mind:

"* * * It is quite impossible to get any rule out of the cases beyond this: That the validity of the mark ends where suggestion ends and description begins. * * *"

The cautionary words of Assistant Commissioner Spencer in Ex parte Pillsbury Flour Mills Co., 1935 C.D. 1, 2, 23 USPQ 168, are as valid today as they were in 1934:

"The difficulty of distinguishing between words which are descriptive and those that are suggestive has always disturbed me. It is of course easy, when passing upon the question, to regard a particular mark intently and to then categorize it spontaneously. Such a process is classification by intuition rather than by deduction. It consists in relying upon one's ability to tell from mere objective inspection

whether a word is descriptive or suggestive. The difficulty with this process, as a judicial one, is that it invariably results in conflicting decisions. No one can be sufficiently consistent to drop all descriptive marks into the box labeled 'descriptive' and suggestive ones into the one labeled 'suggestive.' In no time at all each box will contain an irrational assortment of words, the collection of which, within a single grouping, cannot logically be justified.

"The difficulty is that such marks shade gradually, almost imperceptively, from one type into the other. A single decision leads invitingly to a decision going a little farther afield, that one to another a little more remote, and so on, until one suddenly realizes, generally with dismay, how far he has traveled from the starting point and that the path which once seemed so clear has become thoroughly cluttered and obscured, preventing return to the point of departure. Nevertheless, it is easy to decide a case in this cavalier manner, concluding it by a few remarks to the effect that descriptive words cannot be exclusively appropriated because they are publici juris. As I say, however, the difficulty with this mode of procedure is that in a short time one's decisions become irreconcilable; that this is true can be irrefutably established by referring to prior adjudications on the subject."

A glance at a textbook list of words held descriptive will show what Assistant Commissioner Spencer meant.[6]

■ In the Armour case there was no majority consensus of the test to be applied. Two judges in the main opinion, after analyzing the interests to be protected, concluded that the test for descriptiveness under 2(e) was the same as the likelihood of confusion test under 2 (d). While there is an element of confusion to be considered where a mark is alleged to be deceptively misdescriptive, that is not our concern here. We are more disposed to agree with the concurring opinion of Judge Rich in the Armour case, who stated that the tests under 2(d) and 2(e) are different. We do not think that the test under 2(e) is any less stringent than that under 2(d). A mark descriptive within the meaning of the Trademark Act is not indicative of the origin of the goods. Where the mark more nearly names the goods than points to their source, it is descriptive.

Particularly persuasive of an equally stringent test under 2(e) as under 2(d) is the fact that such terms *may* be registered *only if* they acquire secondary meaning, under the distinctiveness provision of section 2(f). Clearly that is not the case here since there is no evidence that appellee has ever sold any lidocaine anesthetic preparations in this country under the mark LIDOCATON. Such sales are particularly unlikely since appellant is an exclusive licensee under the lidocaine patent which expired May 11, 1965. Thus there has been no opportunity for secondary meaning to attach to LIDOCATON.

In determining whether the mark is "merely descriptive" we start from the assumption that within the meaning of section 2(e) a term *not identical* to the generic word *may be* "merely descriptive." The statute permits some latitude from *identity* toward mere *similarity* which yet is considered to be legally descriptive and thereby unregistrable in the absence of a showing of distinctiveness. We must determine on which side of the line between permissible and prohibited variations the mark here sought to be registered lies. To establish the degree of similarity, we must of necessity resort to an analysis of the mark and generic term.

■ While an analysis for similarity under 2(e) may be like the analysis for similarity under 2(d), *the degree of similarity is not the sole or entire test under*

6. See, e. g. Oppenheim, Unfair Trade Practices (1950) pp. 153–155.

*either section.* After determining the degree of similarity we pass to quite different considerations in a 2(e) case as compared to one under 2(d). When determining likelihood of confusion in 2(d), we consider, for example, sound, appearance, and meaning to establish what is the degree of similarity. We next establish whether confusion would be possible, considering, *inter alia,* the class of goods and purchasers, and any evidence of actual confusion. In contrast, under 2(e) we must determine the degree of similarity as to sound and appearance, and then consider whether the degree of similarity is such that the mark sought to be registered tends to identify the goods rather than the source. We note also from the Meehanite case that a type of latitude exists for the goods as well as the terms. In that case the identical term was descriptive, not of the goods themselves, but of a property of the goods despite the terms of 2(e) (1) "when applied to the *goods* of the applicant is merely descriptive \* \* \* of *them."* [Emphasis ours.]

■ Applying the above considerations to this case, we find ourselves in agreement with the board that the registration of LIDOCATON should not be denied. With regard to similarity, beyond the identity of the first six of the nine letters comprising the mark and generic term, we find significant differences, both in appearance and sound. In considering the identification aspect, we think that the mark, while highly suggestive, does not so powerfully point to the goods rather than the source that registration is precluded. The term here is not so close as those in either the American Druggists' Syndicate case or the Martell case, assuming the result in those cases to be correct.

We do not intend to indicate that registration of LIDOCATON could prevent opposer from using lidocaine to describe his XYLOCAINE. Certainly nothing would bar opposer's use of the term lidocaine. We do not mean to say that anything but the identical generic word may be registered. The test under that view

would be whether the mark sought to be registered appears in the dictionary. That test is not reconcilable with the latitude of prohibited similarity which 2(e) contains. While absence of actual damage is an aspect to be considered, perhaps much like absence of actual confusion it cannot be conclusive. Actual damage or absence thereof is perhaps most applicable in cases of deceptively misdescriptive marks. We are also convinced that opposer in this case will not be "damaged" any more than anyone whose competitor has a strongly suggestive mark.

Accordingly, the decision of the board dismissing the opposition is affirmed.

Affirmed.

RICH, Judge (concurring).

I agree that an affirmance is called for in this case for the reasons stated in my concurring opinion in Armour & Co. v. Organon, Inc., 245 F.2d 495, 44 CCPA 1010, which seems to me indistinguishable from the present case.

The only issue here is descriptiveness of the mark under section 2(e) and I see no point in discussing anything else, particularly the prior confusion in the case law in this field. It does not seem to me to be necessary to review it every time this types of issue comes before us.

I do not know what is meant by the test under section 2(e) being no less "stringent" than the test under 2(d). The test under 2(e) is whether the mark sought to be registered is "descriptive." The test under 2(d) is whether there is likelihood of confusion, deception, or mistake. I see no basis on which to compare the two.

Nor do I see why "secondary meaning" of appellee's LIDOCATON mark is any concern of ours in this opposition. The Patent Office has found that mark to be registrable under the statute. Registration of LIDOCATON is predicated on Swiss registration No. 146,043, filed March 17, 1953, and section 44(e) of the Trademark Act (15 U.S.C. § 1126(e)). Appellee is a Swiss company. Under these circumstances, use of the mark in

this country is not required. Ex parte Societe Fromageries Bel, 105 USPQ 392.

SMITH, Judge (concurring).

The majority opinion reaches a result with which I agree for the reasons ably stated in the unanimous opinion of the Trademark Trial and Appeal Board. See 137 USPQ 899.